## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| **MITCHELL WATERS** <br> **16 Sullivan Court** <br> **Windsor Mill, MD 21244** <br><br>     *Plaintiff,* <br><br> **v.** <br><br> **BALTIMORE CITY, MARYLAND:** <br> **BALTIMORE CITY FIRE DEPARTMENT** <br> **401 East Fayette Street** <br> **Baltimore, MD 21202** <br><br>     *Defendant.* <br><br> **Serve:** <br><br> **The Baltimore City Law Department** <br> **Office of Legal Affairs** <br> **C/O City Hall, Room 250** <br> **100 N. Holliday St.** <br> **Baltimore MD, 21202** <br><br> **Baltimore City Fire Department Headquarters** <br> **401 E. Fayette St.** <br> **Baltimore, MD 21202** | **Case No.: 1:23-cv-1178** <br><br><br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR EQUITABLE RELIEF AND COMPENSATORY DAMAGES

COMES NOW, Mitchell Waters, Plaintiff, (hereinafter "Plaintiff") by and through undersigned counsel, and complains against Defendant, Baltimore City Fire Department, (hereinafter "Defendant" or "BCFD") and in support thereof states as follows:

## INTRODUCTION

1.   This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq*. ("Title VII"); the Civil Rights Act of 1866, Sections

1

1981(a) ("Section 1981") and 1983, 42 U.S.C. § 1320d-6, *et seq*.; and the Maryland Fair Employment Practices Act, Md. Code § 20-601, *et seq*. (FEPA) for the Defendant's unlawful harassment, discrimination based on race and color (African American, Black), hostile work environment, and retaliation against the Plaintiff, including, but not limited to, Defendants' unlawful and discriminatory preference and treatment, as well as retaliating against Plaintiff for his statutorily-protected activity.

## JURISDICTION AND VENUE

2. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq*., and Sections 1981 and 1983, to redress and enjoin employment practices of the Defendant.

3. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

4. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Baltimore, Maryland.

5. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transact substantial business in this District, and Defendants maintain employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

6. Plaintiff has exhausted all of his administrative remedies.

7. Plaintiff filed a complaint with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission (EEOC) on November 10, 2021 (Charge No. 531-2022-00422)

alleging race and color (African American, Black) discrimination, retaliation, and hostile work environment.

8.  On February 9, 2023, the EEOC issued Plaintiff a Right-to-Sue Letter.

9.  Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

10. Plaintiff brings this action to secure protection of rights granted under the statutes mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

11. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, loss of wages due to unlawful and unsubstantiated suspensions, sanctions and penalties.  Loss of career advantage, emotional tranquility, and denial of his constitutional and statutory rights.

12. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

13. Plaintiff, Lieutenant and Firefighter Paramedic Mitchell Waters, is an African American male who resides in Baltimore County.

14. Defendant is a municipal fire protection and emergency medical services provider, whose jurisdiction encompasses Baltimore, Maryland, the State's largest city.

15. Plaintiff works at the Baltimore City Fire Department ("BCFD") and is a member of Baltimore Fire Officers Association IAFF Local 964, which is a Labor Union representing Lieutenants, Captains & Battalion Chiefs of the Baltimore City Fire Department. The relationship between employer representative BCFD and employee representative Local 964 is governed by a Memorandum of Understanding ("MOU").

16. During the relevant period, Defendant employed Plaintiff.

17. During the relevant period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections of Title VII.

## FACTUAL ALLEGATIONS

18. Plaintiff, Lt. Mitchell Waters, has been employed by Defendant, the Baltimore City Fire Department ("BCFD") from October 19, 2011 until present, initially as a Basic Level Emergency medical technician and Firefighter (EMT/FF), until he then advanced himself to a Firefighter Paramedic (FF/PM), and was promoted to Lieutenant on January 5, 2022.

19. Prior to and following his promotion to Lieutenant, Plaintiff has faced a series of actions that have detrimentally affected his position and has been subjected to ongoing discrimination, harassment, hostile work environment, and retaliation for his protected activity.

20. Throughout Plaintiff's career with BCFD, he performed his duties satisfactorily and received accolades and promotions in connection with his job performance. In spite of this, Plaintiff has consistently been subjected to baseless investigations, fictious charges, and unwarranted disciplinary actions alleged in this Complaint. Prior to April of 2021, Plaintiff had no performance infractions and had not received any discipline resulting in a loss of pay or warning that would result in termination on further offense.

21. On or about April 11, 2021, Plaintiff was on duty when, as part of Engine 43, he was dispatched in response to an unconscious person. During the call, he was approached by Baltimore County Medic Emily Cole (White, female) and they engaged in a verbal exchange in which Ms. Cole named dropped her husband in attempt to intimidate Plaintiff. He professionally avoided her but Mrs. Cole became angry with him and met with her husband, Lt. Chris Cole (White, male) at or around 5:00am the following morning to discuss Plaintiff and create a vengeful, false and frivolous complaint.

22. The next day, April 12, 2021, Plaintiff received a Notice of Investigation regarding Ms. Cole's false complaint against him. He was suspended for workplace violence and insubordination without any preliminary hearing that he should have been entitled to, which is a violation of Manual of Procedure 312-1. These actions were acts of retaliation by LT Christopher Cole (White, male) and Battalion Chief Kenneth Haag (White, male) for the alleged verbal exchange between Plaintiff and Emily Cole. The workplace violence charge was later deemed unfounded on July 22, 2021.

23. On April 19, 2021, Plaintiff filed an internal complaint with the Baltimore County Fire Department against Emily Cole for her false complaint. Plaintiff also filed a suit against Mrs. Cole for defamation of character, libel and slander.

24. On April 28, 2021, Battalion Chief ("BC") Kenneth Haag (White, male) forced Michael Bennett (Black, male) to change his "special," a report he had initially filed as a witness to the events occurring on April 12, 2021. In this revised version he was now the complainant.

25. On May 14, 2021, Lt. Cole, Emily Cole's husband, further retaliated against Plaintiff for filing a lawsuit and complaint against his wife. Upon information and belief, he looked up Plaintiff's information in the Maryland Case Search and observed that Plaintiff had

received traffic tickets in 2020. Despite Plaintiff already having reported these tickets to BCFD, when the engine company was called away from the fire company, Lt. Cole went through Plaintiff's personnel file and removed his submissions. This was witnessed by Paramedic Kyle Lovell (White, male), the LGBTQIA+ liaison at the time who reported this to his partner Paramedic Rhonda Johnson.

26. Less than one week later, Lt. William Mieche (White, male) called Plaintiff about his traffic tickets from 2020. Plaintiff advised him that these were already submitted, and he responded that they were missing from Plaintiff's file. Plaintiff came into work to resubmit his specials from copies he had in his folder. Later that day when he returned for his work shift, Plaintiff was placed on Notice of Investigation ("NOI") by Chief Haag for failure to turn in traffic tickets.

27. After multiple investigations, Plaintiff attended the District Court of Maryland and was acquitted of all charges related to the traffic citations that he received in May 2020 and November 2020, on June 11, 2021, and December 2, 2021, respectively.

28. On June 11, 2021, Plaintiff filed an EEO complaint of discrimination against Lt. Christopher Cole (White, male) and BC Haag (White, male) for their harassment and role in the false investigations that were launched against him.

29. On June 15, 2021, BC Earl Taft called Plaintiff to inquire about a petition that he was rumored to have circulated in the Baltimore City Fire Department. Plaintiff informed him that he was unaware of any petitions. Plaintiff maintains this conversation remained informal and no direct orders were given to Plaintiff. However, recognizing this pattern of treatment and inquiry which was intended to threaten the Plaintiff and incite fear, on June

16, 2021, Plaintiff reported this conversation with Chief Taft as harassment, a threat, and an attempt to intimidate him to Brandi Richmond from BCFD HR.

30. On July 16, 2021, Plaintiff filed a discrimination complaint with the Office of the Inspector General ("OIG") and included a list of BCFD employees who had filed similar complaints, establishing a pattern of behavior and indicating how BCFD's administration refuses to act on such complaints, thereby enabling and contributing to this type of culture.

31. On September 27, 2021, Plaintiff subpoenaed paperwork from BC Haag regarding Ms. Cole's complaint against him. When he had previously attempted to obtain the complaint paperwork, Chief Haag (White, male) had instructed Plaintiff's Lieutenant Kenneth McNeil to tell him to get a subpoena if he wanted his cooperation, treatment that other employees were not subjected to. Chief Haag (White, male) then placed Plaintiff on NOI and accused him of attempting to influence an investigation. The complaint related to the investigation had already been dismissed as of two months earlier, on June 17, 2021, before Plaintiff subpoenaed paperwork as instructed by BC Haag. Plaintiff's being unwarrantedly forced to sign a NOI and falsely accused of attempting to influence an official investigation for a complaint that BC Haag (White, male) knew was dismissed was yet another attempt to harass, bully, intimidate and retaliate against the Plaintiff for his protected activity. Non-Black employees were not been subjected to these types of allegations or treatment when attempting to defend against false claims being made against them.

32. On September 30, 2021, Plaintiff amended his previous complaint of discrimination from June 11, 2021. This amendment incorporated the further ongoing retaliation and discriminatory treatment that he was subjected to by BC Haag, wherein he was disciplined

for attempting to influence an already dismissed investigation. The amended complaint of ongoing harassment was filed with Brandi Richmond from BCFD HR.

33. On October 13, 2021, a disciplinary hearing was held for the charge of insubordination against Plaintiff. At this hearing, Plaintiff informed Deputy Chief Arlen Doles that Mr. Michael Bennett was not the original complainant, but rather it was Lieutenant Christopher Cole who was the original complainant.  Upon information and belief, Michael Bennett was compelled by Chief Haag to change his special from that of a witness to that of a complainant. In support, Plaintiff provided Chief Doles with a signed copy of Mr. Bennett's original special. Mr. Doles claimed to have never seen that document, even though his signature was at the bottom of the document. There is recorded audio evidence of this.

34. In an act of retaliation, while on duty on October 19, 2021, Plaintiff was instructed to go to BCFD Headquarters to participate in an interview for a harassment complaint filed against him, the existence of which he had never even been notified by mail, email or certified mail as is required by Manual of Procedure 312-1. BCFD has not produced any paperwork to indicate that Plaintiff was previously notified of this complaint prior to this illegal hearing, in which due process was not followed.

35. On November 8, 2021, while working overtime, Plaintiff was suspended on the spot for insubordination. This was done without a special or complaint being filed against him, and with no obvious complainants. Rather, Plaintiff was suspended on the basis of a verbal complaint that claimed he had violated a direct order of Chief Taft from June 15, 2021 to cease talking to members of the Fire Department about an alleged petition and that he had circulating around the department. There was no petition that he had on file then, and Chief

Taft never clarified what he was referencing. Similarly, Chief Taft never gave Plaintiff such a direct order, as no petition existed for him to prohibit Plaintiff from mentioning. Deputy Chief Charles Svhela (White, male) knew this when he suspended Plaintiff.

36. On November 28, 2021, BC Haag physically pushed Plaintiff in the back while he was on duty discussing work with his Lieutenant, Kenneth McNeil (Black, male). He walked off, then said "excuse me" as if it was a mistake, clearly indicating to Plaintiff in front of other employees that he would continue to bully and harass him with impunity. He did this in front of Plaintiff's Lieutenant to show that he could treat him however he wanted, and that other Black employees under his direction should not feel safe at work as well.

37. After this incident, Plaintiff went off duty from work due to the harassment and stress he was experiencing. He then began therapy for anxiety and panic attacks, and was prescribed medication to treat his condition.

38. On January 5, 2022, Plaintiff was promoted to the rank of Lieutenant, which subsequently made him a member of Local Union 964 and no longer a member of Local Union 734. Coincidently, January 5, 2022 also happened to be the day Deputy Chief Arlen Doles signed two special orders 195-2021 and 196-2021, which unjustly suspended Plaintiff for fourteen (14) days for offenses that he definitively proved he had not committed. The hearings were on October 13, 2021 and November 4, 2021. It typically takes a Deputy Chief two weeks to make a decision regarding disciplinary hearings. It took Chief Doles a total of 82 days to make a decision regarding the hearings. Upon information and belief, this was done purposefully so that Local Union 964 would deny Plaintiff support in filing his grievance once he was no longer a member of Local Union 734.

39. On January 24, 2022, Plaintiff was working overtime at Truck 26 and then transferred to the quarters of Truck 23 following the tragic deaths of three firefighters who had lost their lives earlier that morning on the job. Plaintiff had been performing his duties diligently and would frequently return to the office of Truck 23 where he was assigned to work to complete his reports and other work-related assignments. Mrs. Rachel Butrim, the wife of Lieutenant Paul Butrim, was driven by EVD Matthew Coster to the scene of a fire where her husband had died while on the job. She was informed that her husband was dead and that recovery would take a considerable amount of time, so it was recommended that she and her friends and family members wait at Lt. Butrim's station, Truck 23. The family were given instructions by an off-duty Lieutenant who had no authority at the time to commandeer the office of Truck 23 where the Plaintiff was working, though Plaintiff happened to be responding to an emergency at the time, leaving the office temporarily unoccupied.

40. While the Butrim family and friends were waiting at the Truck 23 office, Plaintiff returned from a call and noticed people in civilian clothes in the firehouse, sitting in chairs in the middle of the floor of the office in which he had been assigned to complete his work. Upon learning the identities of the civilians, Plaintiff expressed his sympathies and expressed kind words regarding the late Lieutenant and then passed by the group with a chair to sit at the desk where he was previously working, to complete his work for the day. Despite this limited interaction, a complaint was filed against Plaintiff alleging that he was disrespectful and discourteous to Mrs. Butrim and her family and friends, which upon information and belief was filed by Mrs. Butrim's friends and family at EVD Matthew Coster's suggestion. As a Black man, Plaintiff was accused of being disrespectful to a group of White women

simply by remaining in the same space where he was assigned to work and continuing to do his job after expressing his condolences, and was held to an unreasonably high expectation of deference to them based on Lt. Butrim's position as a White firefighter who died in the line of duty. Plaintiff not only had the right to be in the office while the family was present; he had a duty and a responsibility to be there with them based off the rules and regulations of the Baltimore City Fire Department, which state that the on-duty company officer (who at that time was the Plaintiff) is responsible for ensuring the safety of visitors while in a firehouse.

41. On January 25, 2022, Plaintiff received his dispositions from the insubordination hearing of October 13, 2021, and the traffic ticket hearing from November 4, 2021, in which Chief Doles found against Plaintiff on all charges and suspended him for fourteen (14) days. Plaintiff again went off duty feeling sick due to the stress and anxiety he experienced in response to this harassment. These are the special orders that were signed on January 5, 2022, the day that Plaintiff was promoted to Lieutenant and joined Local Union 964.

42. Plaintiff filed grievances with local Union 964 in regard to these dispositions, and two days later he received threatening and harassing text messages from Lieutenant Joseph DiRusso (White, male) on January 27, 2022. This is another indicator of how toxic and hostile the workplace at BCFD was, as Plaintiff had not previously had issues with Lt. DiRusso, but he took offense after the details of Plaintiff's complaint were leaked to other employees.

43. On January 31, 2022, Plaintiff met with Captain Michael Hudson (White, male) regarding his grievance hearing and he advised Plaintiff that he had a valid basis for filing because he met the qualifications outlined in the Memorandum of Understanding ("MOU"), such as misapplication of the rules and regulations, and denial of due process.

44. On February 6, 2022, Plaintiff was again retaliated against as Captain Hudson, his Union Representative, reported to him that he and BC Joshua Fannon (Union President) (White, male) refused to move forward with Plaintiff's grievances, despite the validity of his claims. Prior to this date, on February 4, 2022, a viewing was held for the late Lieutenant Paul Butrim, and while attending the viewing Plaintiff stepped outside to speak with Lt. Joseph DiRusso about the special Plaintiff had filed regarding Lt. DiRusso. The conversation was tense, and Plaintiff eventually left the viewing rather than escalate to a conflict. Lt. DiRusso then filed a baseless complaint in retaliation for Plaintiff's complaint and upon information and belief, Lieutenant Joseph DiRusso and EVD Matthew Coster encouraged others to file baseless complaints against him as well.

45. On February 14, 2022, Plaintiff had a disciplinary hearing for his November 2020 traffic tickets, conducted by Chief Laura Shiloh.

46. On February 20, 2022, an investigative interview was conducted with Battalion Chief 2 Ms. Mya McConnell in regard to what had happened on January 24, 2022 in Truck 23's office between Plaintiff and the Butrim family. Plaintiff broke down crying and had a panic attack during the interview after expressing the racism that he was experiencing. It was recorded by Chief Mya McConnell, and Lieutenant Thomas Skinner was in attendance for Local 964.

47. On February 28, 2022, another investigation interview was conducted in regard to Joseph DiRusso's complaints against Plaintiff. The interview was conducted and recorded by Battalion Chief Lancelotti. Union Representative Mike Hudson was present. Plaintiff simply reiterated what he had written in his special. Chief Lancelotti did not record the interview he had with EMT/FF Kenneth Hawkins when, and when Plaintiff's interview

12

was over he refused to provide Plaintiff with a copy of his answers, which he had been given in past interviews, and would not let Plaintiff elaborate beyond "yes" or "no."

48. On March 8, 2022, Deputy Chief Laura Shiloh signed special order number 32-22, which was the results from the hearing on February 14, 2022 involving the traffic tickets from November 2020. Due to the lack of support from Local Union 964, Plaintiff was represented by private counsel with Paramedic Rhonda Johnson as a character witness. Chief Shiloh recommended that the charges be dismissed, and it was approved by BCFD Chief Niles Ford.

49. On March 10, 2022, Plaintiff received an email from Fire Operations Aide (Safety and Members Services) George Theodoroy, who emailed him a Disciplinary Packet with Tracking Number 64-2022 that has since been dismissed. This packet was in reference to the complaint from Lieutenant Joseph DiRusso that was filed on February 6, 2022, which stemmed from the events that occurred on February 4, 2022 while at the viewing for the late Lieutenant Paul Butrim. All witnesses interviewed had corroborated Plaintiff's version of events, with the exception of EVD Matthew Coster who purposely wrote a false statement in attempts to have Plaintiff penalized for something he did not do. It should also be noted that EVD Matthew Coster is the same person who upon information and belief persuaded and encouraged the Butrim family and friends to file false complaints against Plaintiff for the alleged events in the office of Truck 23 on January 24, 2022.

50. On March 11, 2022, Director of Baltimore City Fire Department Human Resources Lisa Wood emailed Plaintiff an outcome letter for his complaint against Chief Kenneth Haag and Lieutenant Christopher Cole. She concluded that Plaintiff's complaints were unsubstantiated, despite Plaintiff presenting an extensive history of harassment from

Battalion Chief Kenneth Haag and EMS lieutenant Christopher Cole. Lisa Wood's decision to dismiss Plaintiff's complaint was the product of political and racial partisanship, and further evidence that the Baltimore City Fire Department does not dole out fair or equal relief for African-Americans as they would Caucasians.

51. On March 16, 2022, Plaintiff placed EVD Matthew Coster on departmental charges for making false statements about him in his special report and interview for complaint tracking number 64-2022, which was the complaint filed by Lieutenant Joseph DiRusso that was dismissed. Making a false statement by omission or commission is a very serious offense in the Baltimore City Fire Department; however, EVD Coster was not penalized for making the false statement. Battalion Chief Kirk Thomas interviewed Plaintiff for the complaint he filed against Matthew Coster, and during this interview Battalion Chief Thomas asked Plaintiff if there was another way he could seek justice against Matthew Coster for his false statements. The question suggests that Battalion Chief Kirk Thomas knew that Matthew Coster would not be penalized by the Baltimore City Fire Department for his false statements, most likely because he is a White male.

52. On April 6, 2022, Plaintiff received an email from Assistant Chief Charles Svehla informing him of a disciplinary hearing with tracking number 54-2022, that was scheduled for April 25, 2022 at 10:30am. This hearing was in regard to the complaints from the family and friends of the late Lieutenant Butrim, who were coerced and persuaded by EVD Matthew Coster to file complaints against Plaintiff. These complaints were racially motivated. The complaints are inconsistent in multiple ways which help to reveal that they are false in nature, given that there are seven different complaints alleging seven different actions taken by Plaintiff.

53. On April 27, 2022, HR Director Lisa Wood emailed Plaintiff an outcome letter for his complaint of workplace violence against Lieutenant DiRusso. She once again concluded that Plaintiff's complaints were unsubstantiated. Upon information and belief, Lisa Wood's decision once again was the product of political and racial partisanship.

54. On May 5, 2022, Plaintiff received anonymous text messages from the number +12405818082. The messages included threats of violence, stalking, vandalism, derogatory, racist and disparaging remarks about Plaintiff. The messages were clearly from someone in the Department with significant knowledge of Plaintiff's protected activity, and who Plaintiff strongly believed to be EVD Coster. The person also made disparaging remarks in regard to Plaintiff's engagement of a lawyer to assist with his complaints of discrimination that he had been subjected to within the Baltimore City Fire Department. The number is similar to the number that texts employees from Telestaff to inform them of overtime availability, +12406604655. Plaintiff reported these messages to the Baltimore City Police Department. Plaintiff also reported that he received these messages to the Baltimore City Fire Department by emailing Battalion Chief William Britcher, but nothing was done about these threatening messages. No investigation was started, no interview, no intervention from the Crisis Intervention Team ("CISM"). The Fire Department did absolutely nothing to address these messages or to ensure Plaintiff's well-being was sufficient to continue to perform his duties for the remainder of the day after receiving these threatening messages.

55. On July 14, 2022, Plaintiff received the results of his hearing for the allegations against him from the Butrim Family under Special Order Number 121-22. Essentially, Chief Eid found Plaintiff at fault for essentially coming to work and doing his job.

56. On July 17, 2022, Plaintiff began the Baltimore City Grievance Process. Local Union 964 President Joshua Fannon demanded that Plaintiff file his grievance with Local 964. Plaintiff refused and provided proof from the Office of the Labor Commissioner that using Union representation to file a grievance is optional and that it is the employee's choice to decide how he wants to file his grievance. Upon information and belief, Joshua Fannon had a personal stake in the situation as he is good friends with the Butrim family, and Plaintiff did not believe he would in fact file his grievance just as he had denied the filing of Plaintiff's grievance in the past.

57. On August 3, 2022, Plaintiff received notification via email that he had been scheduled for a grievance hearing with Hearing Officer Corey Thomas from the Office of the Labor Commissioner. The hearing date was originally scheduled for September 16, 2022, but was rescheduled due to a scheduling conflict to September 22, 2022 at 9:30am via Microsoft Teams. On September 22, 2022, the grievance hearing took place remotely before Mr. Corey. Paramedic Rhonda Johnson and EMT/FF Brandon Johns were witnesses for Plaintiff. Local 964 President Joshua Fannon was in attendance, even though Plaintiff strongly requested for him not to be permitted to observe or participate due to his belief that Mr. Fannon had a personal vendetta against him. Battalion Chiefs Mya McConnell and John Eid were witnesses for the Department due to their roles in the investigation and disciplinary process, along with Deputy Chief Charles Svhela and EVD Matthew Coster.

58. On September 25, 2022, after working a 38-hour shift at his assigned station Engine 27 from September 23, 2022 through September 24, 2022, Plaintiff was scheduled to work at Engine 5 for ten (10) hours of overtime, which would result in him working 48 hours straight for that shift. Plaintiff arrived at Engine 5 after 7am, because he was coming from

Engine 27. Deputy Chief Thomas Tosh attempted to place Plaintiff on lateness charges because he was "late" for work coming from work within Baltimore City Fire Department from Engine 27. No member can be placed on lateness charges when transferring shifts to work at another station; this is a situation that happens nearly daily, and the last time Plaintiff worked at Engine 5 before this incident, on August 3, 2022, Pump Operator Joshua Cordell (White, male) (#2226) was late arriving to Engine 5 after working at Engine 13 during the day which caused the company to open late. These were the same circumstances under which Deputy Chief Tosh attempted to charge Plaintiff with lateness, but there was no attempt to place Mr. Cordell on similar charges. Deputy Chief Tosh eventually discontinued his pursuit of charges, but Plaintiff asserts that this attempt was racially biased, discriminatory and retaliatory in nature.

59. On October 5, 2022, while working an overtime 10-hour day shift at Engine 51, Chief Jason Goodwin came to the station to talk to Plaintiff about possibly being placed on charges regarding the door at Engine 27 that needed to be repaired the night before on October 4, 2022 while Plaintiff was working his regular shift. Plaintiff reported that the door was inoperable to Battalion Chief Glenn Kokucka on October 4, 2022, and there was a door repairman who came in to attempt to fix the door but was unsuccessful. The repairman stated that he required more tools and that the door was experiencing normal wear and tear issues. On October 5, 2022 Chief Goodwin stated that there was an attempt to place Plaintiff on charges for "breaking into" the control box in an attempt to repair the door. Plaintiff explained to him that the control box was always open, and that the members of Engine 27 manually use that box when the door becomes inoperable. Plaintiff expressed to Chief Goodwin that this was a ridiculous attempt to place him on charges, and Chief

Goodwin responded by saying, "Well, when you are at odds with the Department they tend to do stuff like this;" admitting that the Department was targeting and harassing Plaintiff in retaliation for his protected activity.

60. On October 25, 2022, Plaintiff received a decision from the Office of the Labor Commissioner for the hearing held on September 22, 2022. Mr. Corey did not rule in Plaintiff's favor. On October 28, 2022, Plaintiff informed Office of the Labor Commissioner representative Ms. Deborah Moore-Carter that he rejected the decision from the Office of the Labor Commissioner and would be moving forward with the fourth step of the grievance process. On October 30, 2022, Plaintiff emailed Valerie Weldon and Julia LeGendre from Baltimore City Human Resources copies of all the documents and evidence needed to move forward with the grievance process. On October 31, 2022, Ms. LeGendre responded to Plaintiff's emails and informed him that she was moving forward with coordinating the fourth step and would inform him of a date when everything was scheduled with the Panel Members. Ms. LeGendre also recommended that Plaintiff report a portion of his evidence to the police, related to the threatening text messages he had received.

61. On December 20, 2022 the fourth step in Plaintiff's grievance process was conducted, in which another hearing was held remotely and Plaintiff's case was heard by the head of three outside agencies; Quinton Herbert, Director and Chief Human Capital Officer for the Department of Human Resources ("DHR"); Corren Johnson, Interim Director for the Department of Transportation ("DOT"); and Jason Mitchell, Director of the Department of Public Works ("DPW"). Plaintiff was told he would receive a decision between thirty and sixty days from the date of the hearing.

62. On January 6, 2023, while responding to 820 Argonne Drive, Apt. E, Incident Number 0002821-000, which was a fire box assignment, Plaintiff discovered that there was a nail intentionally placed in his turnout boot by someone in an attempt to injure him. He took a picture of the nail.

63. On January 13, 2023, Plaintiff was working overtime at Engine 33 and a family member stopped by to drop off food to him. This family member came into Plaintiff's office on the second floor during normal firehouse visiting hours, which are 9am to 9pm. Battalion Chief 2 John Macken came into the firehouse and crept up the stairs to catch Plaintiff by surprise and force his family member visitor to leave the firehouse. Chief Macken stated that visitors were not allowed on the second floor of a firehouse. Plaintiff's visitor then exited the firehouse. This was significant, because on January 24, 2022 the Butrim family and friends, who are White, were allowed on the second floor of the firehouse into the office Plaintiff was working in that day. While Plaintiff acknowledges that this occurred under unusual circumstances, it is clear that there is also no written rule that says family members are not allowed on the second floor of the firehouse. This further shows the racial bias consistently on display by the Baltimore City Fire Department, even as it relates to the citizens the Department serves.

64. On January 19, 2023, the case between Plaintiff and Emily Cole was heard at the District Court of Maryland and was dismissed. Plaintiff obtained the recording of the hearing in which the Battalion Chief committed perjury while giving his account of what happened on the night of April 12, 2021.

65. On March 1, 2023, Julia LeGendre emailed Plaintiff the decision for his fourth step grievance hearing, in which his grievance was again denied.

66. On March 3, 2023, BCFD Command staff harassed Plaintiff about being late to a school event at Sinclair Lane Elementary School, though he was late because a subordinate under his command, Denard Davis, required medical attention and transport to the Public Safety Infirmary after reporting a medical condition that prevented him from continuing his work shift.

67. On April 2, 2023, Baltimore City Fire Department compelled Plaintiff to sign a notice of investigation for being late after working a 14-hour overtime night shift at Truck 26, which is located at 4315 Mannasota Ave, requiring Plaintiff to then drive 30 minutes across town to 3220 Frederick Ave to continue working overtime at Engine 30 for another 24 hours. Lt. Hagley, who was Plaintiff's relief, did not properly and formally relieve him. He texted Plaintiff's phone at 0538 hours and again at 0625 hours. Plaintiff saw neither message until 0648 hours, which is when he responded to Lt. Hagley. Plaintiff gathered his belongings and turn out gear, gave a face-to-face report to Lieutenant Hagley, and headed to Engine 30; all before 0700 hours, which is when Plaintiff's shift was scheduled to end. Due to the Fire Department being short staffed, late relief chains happen all the time for various reasons, but no one is ever placed on charges for being late in transit between two stations after waiting for relief from duty. Examples of this include April 1, 2023, when EMT/FF Keith Harvey was working overtime on Engine 41 and relieved EMT/FF Andrew Gazzermiller after 0700, causing extra overtime to be generated for EMT/FF Gazzermiller. EMT/FF Harvey was not forced to sign an NOI for being late, as Plaintiff was. On April 2, 2023, firefighter Andrew Schaffer was late arriving to Engine 58 where he was scheduled to work overtime and relieve EMT/FF Antonio Wallace after working a shift at Truck 6. EMT/FF Antonio Wallace was therefore late to his scheduled overtime shift at Truck 29,

which generated overtime for FF/PM Chon Bunch, who EMT/FF Antonio Wallace relieved. Neither Firefighter Andrew Schaffer nor EMT/FF Antonio Wallace were placed on NOI for arriving late to another station. On March 25, 2023, Captain Michael Spencer worked a 24-hour overtime shift at Engine 47 after working the previous night at Truck 27. Captain Spencer left the quarters of Truck 27 at 0745 hours and arrived at Engine 47 at 0820 hours, which generated an hour and a half of overtime for Captain Bryan Knatz. Captain Spencer was not forced to sign an NOI for lateness. Rules and Regulations No. 42:03 states that members are to remain at their assigned duty until properly relieved. Proper relief of duty or transfer of command is done face-to-face, not via text message. Lieutenant Hagley did not properly relieve Plaintiff of duty. His tour of duty was scheduled to end at 0700 hours, and Plaintiff did not sleep past his hours when his shift was supposed to end. There was no rule, regulation, or other criteria set, or any procedure violated by Plaintiff on this date. This is a further act of harassment and retaliation from the Baltimore City Fire Department towards Plaintiff.

68. All of the above instances are evidence of the consistent discriminatory treatment that Plaintiff faced at the hands of BCFD representatives for no reason other than that his skin color is darker than his coworkers'. The more Plaintiff spoke up about the treatment he was facing, the more he was subjected to a hostile work environment and retaliation.

69. In contrast to Plaintiff, other BCFD members not of his protected categories have received more favorable treatment and have not been subjected to the same constant harassment and baseless charges, while a pattern of disparate treatment towards male and female Black members is apparent:

- Lieutenant Joseph DiRusso (White, male) was not charged with workplace violence after threatening Plaintiff via social media messenger.

- EVD Matthew Coster (White, male) was allowed to make a false statement in attempts to incriminate Plaintiff without any penalty or consequence.

- On December 12, 2017, Lt. Randolph Williams (African American, male) was assaulted on a fire ground by a White male member of Engine 13. Randolph Williams was pushed in his chest by the white male member. After being assaulted, Randolph Williams was unwarrantedly threatened to be suspended for insubordination. Once Randolph Williams expressed that he was assaulted and wanted to file workplace violence charges, the Incident Commander and the Chiefs on scene decided to abort the attempt to place Randolph Williams on charges only because the White member had committed a much more egregious offense than the one Randolph Williams was being falsely accused of. In the same incident, Jason Leggette (African American, male) was also injured due to the White male members of Engine company 13 yanking a hose out of his hand on purpose in an attempt to cause a slowdown with Engine Company 52's advancement of fire hose to extinguish the fire. This action caused an injury to Jason Leggette that would not allow him to work for several months.

- On April 4, 2021, Lieutenant Randolph Williams (African American, ale) had a dispute with the late Lieutenant Paul Butrim (White, male) while they both were assigned to Engine Company 57. Engine Company 57 is a Hazmat response unit, and therefore the members assigned to Engine Company 57 are entitled to receive Hazmat Pay. Lieutenant Butrim was taking it upon himself to go on the computer

and remove the Hazmat pay from the African American members on Lieutenant Randolph Williams' shift. When Lieutenant Williams approached Lieutenant Butrim about removing the Hazmat pay from the African American members, Lieutenant Butrim became defensive and told Lieutenant Williams that he was "not taking a bust in the ass for the members receiving money that they were not supposed to receive." It was not Lieutenant Butrim's duty or responsibility to go on another Lieutenant's payroll and remove the Hazmat pay from only the African American members. Lieutenant Williams attempted to file a grievance in regard to the discrepancy, but 964 Union President Joshua Fannon (White, male) who upon information and belief was good friends with Lieutenant Butrim, refused to file Lieutenant Williams' grievance. Lieutenant Williams has since filed a complaint with the Equal Employment Opportunity Commission ("EEOC").

- On January 25, 2022, Lieutenant Michael Spencer (African American, male) was assaulted on a fire ground by Lieutenant Joseph Stagliano (White, male). While Lieutenant Spencer was donning his gear to safely enter an environment inherently dangerous to life and health ("IDLH"), he was assaulted from behind by Lieutenant Stagliano, who kicked Lieutenant Spencer's helmet and attempted to push Lieutenant Spencer to the ground. This assault was witnessed by members of Engine 52. Once outside of the burning building, Lieutenant Spencer verbally reprimanded Lieutenant Stagliano for his actions inside an IDLH environment, and informed Lieutenant Stagliano that the Department had just lost three members on January 24, 2022 in the Stricker Street fire on the previous day. A few days later, Lieutenant Spencer was suspended for workplace violence. Lieutenant Stagliano

received no reprimand or any other form of discipline for his violence towards Lieutenant Spencer. Since then, Lieutenant Spencer has not been allowed to work at his assigned station at the quarters of Engine 52. This has had a negative effect on Lieutenant Spencer's subordinates and also on Lieutenant Spencer himself. The Department is sending a message to African American members that says they can be subjected to physical violence at the hand of White members, and the perpetrators will suffer no consequences.

- In 2019, Paramedic Anthony Sweeney was terminated from the Baltimore City Fire Department after verbalizing that he was uncomfortable with someone standing behind him as he provided a post vehicular accident urinary sample. According to Manual of Procedure 336, Paramedic Sweeney was entitled to be tested for shy bladder if he expressed a valid medical condition of being unable to urinate with someone watching him. This opportunity was not afforded to Paramedic Sweeney. Instead, Paramedic Sweeney was terminated after staff lied at a recorded hearing, in which they stated Paramedic Sweeney was given specific directions after speaking to Chief Officer Mr. Roman Clark. Mr. Clark denied ever speaking to Paramedic Sweeney or giving him any directions. Megan Fannon, (White, female) and Alex Mizurak (White, male) similarly expressed the same valid medical concerns as Paramedic Sweeney, but they both are still actively employed by the Baltimore City Fire Department.

- Crystal Saunders (African American, female) was medically retired after she sustained a line-of-duty injury which caused injury to her wrist. After being on medical leave for nearly a year, the Baltimore City Fire Department would not

allow her to operate in another capacity as a BCFD employee. Ms. Saunders had been an EMT for 18 years prior to coming to BCFD. Due to the injury she sustained while working as a Baltimore City employee, she is unable to perform the duties that she had for the past 18 years as an EMT. However, Shane Horne (White, male), who was originally assigned to Engine Company 55, sustained an injury while off duty which left him paralyzed from the waist down. Mr. Horne was allowed to continue his employment with BCFD despite him being wheelchair bound, and currently is assigned to fire supply. The Baltimore City Fire Department has gone to great lengths to accommodate Mr. Horne, while Ms. Saunders was completely robbed of her identity as an EMT and her career. Ms. Saunders expressed that she received little to no help from BCFD in helping her to retain her employment, and the experience has left her unable to thrive and has robbed her of her passion and ability to operate as an emergency medical technician.

- On March 10, 2022, while assigned to Engine 20 and working on a fireground on North Ave, Lieutenant DeVonte Weaver (African American, male) was attacked by Lieutenant Kenneth Van Dommelen Jr. (White, male). Lieutenant Van Dommelen pulled Lieutenant Weaver down a flight of stairs while inside of a burning building. Lieutenant Weaver at the time of the attack was unsure of who pulled him off the stairs, but felt that his life and safety was in danger. After the incident was placed under control and it was discovered that Lieutenant Van Dommelen was the one who attacked Lieutenant Weaver, they both were asked to speak to the Chief, who was Incident Commander Michael Rudasill. Lieutenant Van Dommelen willingly admitted to the Chief that he attacked Lieutenant Weaver.

Chief Rudasill did nothing to reprimand Lieutenant Van Dommelen, and he was not suspended or placed on workplace violence charges. Lieutenant Weaver has placed Lieutenant Van Dommelen on charges for workplace violence, but Lieutenant Van Dommelen has yet to be suspended who have any penalty incurred against him. In contrast, Plaintiff was suspended for workplace violence for an alleged "threatening look," and Lieutenant Michael Spencer was suspended for workplace violence after verbally reprimanding a Lieutenant who physically assaulted him. Lieutenant Van Dommelen admitted to committing an act of workplace violence but was never penalized.

- On July 1, 2022, Lieutenant Randolph Williams requested for EVD Charles Evers (White, male) to be tested for reasonable suspicion of drug use, but Chief Aaron Wodka (White, male) would not concur. Chief Wodka instead sent EVD Evers down to be treated and placed off duty for "back pain." Plaintiff has seen video evidence of EVD Evers "nodding out," as would a person under the influence of a mind-altering substance. In 2019, Paramedic Adrian Smith (African American, male) sought treatment for substance abuse as outlined by Baltimore City Fire Department's manual procedures. Paramedic Smith did not receive the treatment he was seeking, but instead was terminated from the Baltimore City Fire Department and had to legally fight to regain his employment.

- On March 27, 2023, Lieutenant Janiqua Smith (African American, female) gave direct orders to her subordinate Pump Operator Jerry Ford (White, male), and he became irate and begin to act in a threatening manner towards her. Lieutenant Smith informed the on-duty Battalion Chief Daniel Nott of the incident, reporting that she

was uncomfortable working with Mr. Ford and that he was insubordinate, which is an offense that warrants immediate relief of duty and suspension. Battalion Chief Daniel Nott conferred with on-duty Shift Commander John Eid, and he refused to honor Lieutenant Smith's request and instead forced her to work with a White male who she was uncomfortable working with.

70. Plaintiff has since been the target of race and color discrimination, retaliation, and workplace hostility. The aforementioned misconduct was so egregious and pervasive that it has affected the Plaintiff's mental, emotional, and physical wellbeing in irreparable ways.

71. Plaintiff is now forced to file suit due to the Defendant's inability to remedy its unlawful conduct, which has cost Plaintiff significant financial strain as well as emotional distress. Due to the discriminatory and retaliatory treatment Plaintiff experienced, he suffers daily stress and anxiety and has experienced lasting harm to his career advancement which are ongoing to this day.

72. The Defendant's discriminatory and retaliatory practices have been effectuated in violation of both Title VII of the Civil Rights Act and Section 1981/1983.

## <u>COUNT I</u>

### VIOLATION OF TITLE VII – RACE AND COLOR DISCRIMINATION

73. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

74. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

75. Here, the four (4) elements of a *prima facie* case of race discrimination are met. The Plaintiff is African American and Black, and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964. Additionally, Plaintiff is a qualified Firefighter Paramedic, as he has almost twelve (12) years on the job and obtained the title of Lieutenant. Plaintiff has suffered adverse employment actions directly related to his position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964.

76. Plaintiff is a member of a protected class as an African American man.

77. Because of his race, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

78. Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

79. Defendant knew that Plaintiff was African American prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his race.

80. Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his race.

81. Defendant reprimanded Plaintiff in a way that deprived him of workplace safety and otherwise adversely affected his status as an employee because of his race.

82. Other employees who were similarly situated, but were non-Black or Caucasian individuals, have been treated more favorably than the Plaintiff with regard to the terms and conditions of employment and workplace conditions.

83. Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

84. Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

85. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

86. Further, Defendant's treatment and actions are ongoing.

87. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his race.

88. Defendant discriminated against Plaintiff because of his race by engaging in, tolerating, or failing to prevent race discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

89. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

90. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, medical expenses, and costs – and is entitled to all available legal and equitable remedies.

91. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

92. Baltimore City Fire Department must comply with Title VII, but by and through its conduct, has violated Title VII.

## COUNT II

## VIOLATION OF TITLE VII – HOSTILE WORK ENVIRONMENT

93. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

94. When hostile work environment is alleged to have occurred as a result of unlawful discrimination, the Complainant must show that: (1) he belongs to a statutorily protected class; (2) he was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on his statutorily protected class; (4) the harassment affected a term or condition of employment[1] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

95. The actions and conduct of the above-described perpetrators as set forth herein created a hostile, offensive and intimidating work environment based upon Plaintiff's race and detrimentally affected Plaintiff.

96. The actions and conduct by the above-described perpetrators as set forth herein were severe and pervasive and constituted discrimination based on race.

97. The actions and conduct described herein would have detrimentally affected a reasonable person of the same race in Plaintiff's position.

---

[1] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

98. Defendant knew or should have known of the harassment, discrimination, and disparate treatment described herein. Defendant has failed to address the problems and further failed to implement effective and appropriate measures to stop these acts.

99. By failing to conduct a prompt and thorough investigation of Plaintiff's allegations of discrimination; failing to redress the discrimination of Plaintiff; by consciously failing to protect Plaintiff from discrimination within the Department; and by punishing Plaintiff for his complaints of discrimination and disparate treatment, Defendant exacerbated the hostile work environment suffered by Plaintiff and intentionally discriminated against Plaintiff in violation of Title VII.

100. Defendant's actions, and failure to act, amounted to discrimination under Title VII and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment abrogates the states' Eleventh Amendment sovereign immunity. Title VII, through the 1972 amendment known as the Equal Employment Opportunity Act ("EEOA"), provides an enforcement remedy for equal protection violations of state employees through Section 5 of the Fourteenth Amendment.

101. As a direct result of Defendant's unlawful acts, Plaintiff has suffered damages, including but not limited to lost wages and emotional and mental distress.

## COUNT III

### VIOLATION OF TITLE VII – RETALIATION

102. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

103.    Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

104.    Here, Plaintiff faced retaliation for the complaints he submitted internally with the Department and subsequent grievance procedures, as well as externally with the EEOC.

105.    Soon after complaining, Plaintiff was subjected to the ongoing unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

106.    Defendant subjected Plaintiff to the aforementioned adverse employment actions because of his opposition to the unlawful and discriminatory employment practices of Defendant in violation of Title VII.

107.    Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEO representative, or otherwise should have known that Plaintiff engaged in the complaint process based on his informal and formal complaint filings. The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

108.    Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

109.     Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

110.     Similarly situated employees (no known prior EEOC activity) were not subjected to the same, similar, or any adverse treatment.

111.     Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Title VII.

112.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

113.     Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

114.     Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

115.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

116.     Defendants' actions were intentional, reckless, and malicious.

117.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

118.     Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature. Further, Defendant's treatment and actions were ongoing.

119.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

120.     Baltimore City Fire Department must comply with Title VII, and by and through their conduct, violated the law.

## COUNT IV

**SECTION 1983 CLAIM FOR VIOLATION OF PLAINTIFF'S CIVIL RIGHTS UNDER SECTION 1981 OF THE CIVIL RIGHTS ACT**

121.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

122.     Plaintiff brings a claim of violation of his freedom of speech and freedom of expression under the First Amendment to the U.S. Constitution by Defendant and its named Responsible Management Officials, for its acts of retaliation in violation of 42 U.S.C. §1981 through 42 U.S.C. §1983.

123.     Section 1983 provides an individual the right to sue state government employees and others acting "under color of state law" for civil rights violations.

124.     The Defendant, and its responsible management officials, under 42 U.S.C. § 1983 are persons who acted "under the color of state law."

125.     Defendant, BCFD, unlawfully deprived Plaintiff of his civil rights in violation of Sections 1981 and 1983 of the Civil Rights Act and the First Amendment when it retaliated against Plaintiff for having engaged in protected activity by complaining of discrimination

on the basis of his race, thereby punishing Plaintiff for exercising his rights and discouraging him as well as others from continuing to exercise such rights in the future.

126.    Defendant treated Plaintiff disparately or pretextually in the terms and conditions of his employment compared with the way non-Black employees, or employees that had not engaged in protected activity by complaining of disparate treatment, were treated.

127.    Plaintiff alleges that because he engaged in protected activities, he was illegally subjected to a pattern of further retaliation, harassment, and disparate treatment.

128.    The acts described above are part of an institutional practice or custom, constituting an official policy of the Baltimore City Fire Department to cover up officer misconduct, discrimination, and retaliation against fellow members who stand up against the Department for violations of their civil rights that should protect them from discrimination and retaliation in the workplace.

At all times relevant hereto, Defendant acted pursuant to a custom or policy of the Baltimore City Fire Department.

129.    Defendant failed to adopt clear policies and failed to properly train its management officials in handling, managing, and protecting employees who engage in statutorily-protected activities within the Department.

130.    As an African American, Plaintiff is a member of a protected class.

131.    Because of his race (African American) and his engagement in protected activity, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint under Section 1983.

132.    Defendant's foregoing unlawful adverse actions materially affected the terms, privileges, and conditions of Plaintiff's employment.

133.     Defendant knew that Plaintiff had complained of discriminatory and disparate treatment prior to the adverse actions described throughout the Complaint and was aware or should have been aware of the discrimination Plaintiff was subjected to because of his race and the retaliation that he was subsequently subjected to.

134.     Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his race (African American) and for his participation in statutorily-protected EEO activity.

135.     Defendant has limited, segregated, and classified Plaintiff in a way that deprived him of employment opportunities and otherwise adversely affected his status as an employee, because of his race (African American) and in retaliation for his statutorily-protected activities.

136.     Other employees who were similarly situated, but members of a different class than Plaintiff, have been treated more favorably than the Plaintiff in the terms and conditions of employment.

137.     Plaintiff consistently attempted to report the pervasive culture and custom within BCFD of treating African American members differently than White members when it came to promotions, disciplinary actions, and conduct.

138.     Plaintiff's allegations clearly show a custom of retaliation as required by Section 1983.

139.     Plaintiff's engagement in protected EEO activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

140.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

141.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his race (African American) and was in retaliation for his protected conduct.

## COUNT V

## VIOLATION OF MARYLAND FAIR EMPLOYMENT PRACTICES ACT ("FEPA")

142.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

143.     The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

144.     Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing, promotion and demotion, and reassignments) or directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions.  Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

145.     Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

146.     The Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his race (African American) and color (Black).

147.    Pursuant to the Local Government Tort Claims Act ("LGTCA"), Md. Code (2020

Repl. Vol., 2021 Supp.), § 5-301 et seq. of the Courts and Judicial Proceedings Article

("C.J."), Plaintiff has provided sufficient notice to Defendant through his filing of internal

and federal EEO charges regarding the claims stated in this Complaint.[2]

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Lt. Mitchell Waters, respectfully prays that this Court grant him

the following relief:

a.    Enter a declaratory judgement finding that the foregoing actions of Defendant violated

Title VII, Sections 1981 and 1983, and FEPA;

b.    Enter a permanent injunction directing Defendant to take all affirmative steps necessary to

remedy the effects of the illegal, discriminatory conduct described herein and to prevent

similar occurrences in the future;

c.    Award back pay and compensatory damages in the amount of $500,000 (five hundred

thousand dollars and zero cents) that would fully compensate Plaintiff for the economic

loss, loss of promotional potential, reputation, lost wages, lost job benefits; physical and

psychological injury, humiliation, embarrassment; and mental and emotional distress

caused by the conduct of the Defendant alleged herein;

d.    Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

e.    Order such other relief as this Court deems just and equitable.

---

[2] "[S]trict compliance with the notice provisions of the LGTCA is not always required; substantial compliance may suffice." *Renn v. Bd. of Comm'rs of Charles Cty*, 352 F. Supp. 2d 599, 603 (D. Md. 2005). Substantial compliance is satisfied "[w]here the purpose of the notice requirements is fulfilled, but not necessarily in a manner technically compliant with all of the terms of the statute." *Id.* In the context of employment discrimination, some courts have held that notice of an EEOC charge constitutes substantial compliance, at least if notice is provided to defendant by the LGTCA deadline and the charge provides "the identity of the claimant, the time and place of the event, the nature of the claim, and the Plaintiff's intent to pursue litigation." *Nelson v. City of Crisfield*, L-10-1816, 2010 WL 4455923, at *2 (D. Md. Nov. 5, 2010).

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable herein.


Dated: May 4, 2023

Respectfully submitted,

By: /s/ Dionna Maria Lewis
Dionna Maria Lewis, Esq.
Bar No. 19486
District Legal Group, PLLC
700 Pennsylvania Ave SE, Suite 2098
Washington, D.C.20003
Tel. (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff Mitchell Waters*